Merrell v. Smith, 2023 NCBC 2.

STATE OF NORTH CAROLINA

MECKLENBURG COUNTY

CARL E. MERRELL; LYLE RANSON;
JEANETTE RANSON; CRAIG S.
MILLER; WANDA EDWARDS
MILLER; and ROBERT J. NASTASE,

Plaintiffs,

v.

JAMES M. SMITH; JENNIFER
SMITH; and CAROLINA BEER &
BEVERAGE GROUP, LLC f/k/a
CAROLINA BEER & BEVERAGE,
LLC,

Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION

19 CVS 21650 [MASTER FILE]
Related Cases:
19 CVS 22027
19 CVS 23665
**Also filed in 21 CVS 15205**

**ORDER AND OPINION ON
DEFENDANTS JAMES M. SMITH
AND JENNIFER SMITH'S MOTIONS
FOR SUMMARY JUDGMENT**

1.     **THIS MATTER** is before the Court on Defendants James M. Smith ("Mike Smith") and Jennifer Smith's (together, the "Smiths") Motions for Summary Judgment, pursuant to Rule 56 of the North Carolina Rules of Civil Procedure (the "Rule(s)"), seeking entry of judgment in their favor on all remaining claims brought by Plaintiffs filed in each of four factually related cases.  The Smiths' Motions for Summary Judgment and the corresponding four cases are: *Cochrane, et al. v. Smith, et al.*, (19 CVS 23665) ("*Cochrane*"), (*Cochrane*, ECF No. 151); *Merrell, et al. v. Smith, et al.*, (19 CVS 21650) ("*Merrell*"), (*Merrell*, ECF No. 141); *Strack, et al. v. Smith, et al.*, (19 CVS 22027) ("*Strack*"), (*Strack*, ECF No. 199); and *Short, et al. v. Smith, et*

*al.,* (21 CVS 15205) ("*Short*"), (*Short*, ECF No. 43) (together, the "Motions").[1]  Because the Motions raise the same legal issues, the Court considers the Motions together.

2.     For the reasons set forth herein, the Court **GRANTS** the Motions.

*Hemmings & Stevens, PLLC, by Aaron C. Hemmings, for Plaintiffs Pamela Boileau, the Estate of Ralph N. Cochrane, Carolyn Crozier, the Estate of Thomas J. Crozier, Jr., Rita Dilling, Mallory Johnson, Kent Kalina, Roy Lynam, Carl E. Merrell, Craig S. Miller, Wanda E. Miller, Robert J. Nastase, Dallas Pendry, Jr., Jeanette Ranson, Lyle Ranson, Charles D. Short, Jeffrey A. Strack, Penny N. Strack, and James C. Wilson.*

*Bell, Davis & Pitt P.A., by Edward B. Davis, and Parker Poe Adams & Bernstein LLP, by Michael G. Adams, Morgan H. Rogers, Nicholas H. Lee, and Alexandra Davidson, for Defendants Jennifer Smith and James M. Smith.*

*Alexander Ricks, PLLC, by Alice C. Richey, Benjamin Leighton, and Mary K. Mandeville, and Morgan, Lewis & Bockius, LLP, by Thomas Peter R. Pound and John A. Vassallo, for Defendants MSI Financial Services, Inc. and Metropolitan Life Insurance, Co.*

*F. Lane Williamson, Administrator, for Defendant Estate of Richard C. Siskey.*

Robinson, Judge.

## I.     INTRODUCTION

3.     This dispute arises out of an alleged fraudulent scheme carried out by Richard C. Siskey ("Siskey") with the assistance of the Smiths.  The Court previously recited in detail the factual allegations surrounding this purported scheme in its 22 December 2020 Order and Opinion on Defendant Carolina Beverage Group, LLC's

---

[1] On 1 April 2020, the Court adopted a consolidated case caption with the *Merrell* action designated as the "Master File" for the four cases. (*Strack*, ECF No. 49.)  The order did not formally consolidate the cases pursuant to Rule 42, (*see Strack*, ECF No. 49), but the parties agreed in the Case Management Plan to coordinate certain discovery matters and motions practice, (*Merrell*, ECF No. 25; *Strack*, ECF No. 34).

motion to dismiss in *Strack*, *Merrell*, and *Cochrane*.[2] *See, e.g.*, *Merrell v. Smith*, 2020 NCBC LEXIS 150, at *2–14 (N.C. Super. Ct. Dec. 22, 2020). The Court further recited many factual details relevant to the Motions in its 13 December 2022 Order and Opinion on Plaintiffs' Motions for Summary Judgment in *Strack*, *Merrell*, *Cochrane*, and *Short*. *See Merrell*, 2022 NCBC LEXIS 155, at **1 n.1.[3]

4. This Opinion concerns seven claims brought by the Plaintiffs, former members of Carolina Beverage Group, LLC f/k/a Carolina Beer and Beverage ("CBB"), against the Smiths: (1) breach of fiduciary duty; (2) fraud by omission and concealment; (3) fraud in the inducement; (4) North Carolina securities fraud; (5) constructive fraud; (6) civil conspiracy; and (7) negligent misrepresentation.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

5. The Court does not make findings of fact when ruling on motions for summary judgment. "[T]o provide context for its ruling, the Court may state either those facts that it believes are not in material dispute or those facts on which a material dispute forecloses summary adjudication." *Ehmann v. Medflow, Inc.*, 2017 NCBC LEXIS 88, at *6 (N.C. Super. Ct. Sept. 26, 2017); *see also Hyde Ins. Agency, Inc. v. Dixie Leasing Corp.*, 26 N.C. App. 138, 142 (1975) (encouraging the

---

[2] Plaintiffs voluntarily dismissed their claims against Defendant Carolina Beverage Group, LLC with prejudice on 22 December 2021. (*Cochrane*, ECF No. 147; *Merrell*, ECF No. 137; *Strack*, ECF No. 192; *Short*, ECF No. 18.)

[3] Given the overlap in facts between the Motions and the motions before the Court in *Merrell v. Smith*, due to much of the same conduct being at issue in the Motions now before the Court, several facts from *Merrell v. Smith* are re-stated herein. *See* 2022 NCBC LEXIS 155 (N.C. Super. Ct. Dec. 13, 2022).

trial court to articulate a summary of the relevant evidence of record to provide context for the claims and the motion(s)).

A. **The Parties**

6. The plaintiffs in the *Merrell* matter are Carl E. Merrell, Craig S. Miller, Wanda E. Miller, Robert J. Nastase, Lyle Ranson, and Jeanette Ranson (together, the "*Merrell* Plaintiffs").[4] (Second Am. Compl. ¶¶ 6, 8, 10–11, *Merrell*, ECF No. 24.)[5]

7. The plaintiffs in the *Strack* matter are Pamela Boileau, Carolyn Crozier, the Estate of Thomas J. Crozier, Jr.,[6] Rita Dilling, Mallory Johnson, Kent Kalina, Roy Lynam, Dallas Pendry, Jr., Jeffrey A. Strack, Penny N. Strack, and James C. Wilson (together, the "*Strack* Plaintiffs"). (Second Am. Compl. ¶¶ 8–10, 12–17, *Strack*, ECF No. 33.)

8. The plaintiffs in the *Cochrane* matter are Jeff Cochrane and Gary Cochrane, as administrators of the Estate of Ralph N. Cochrane. (Am. Compl. ¶¶ 1, 8, *Cochrane*, ECF No. 7.)

---

[4] Plaintiff Robert J. Nastase died on 13 March 2022. (*Merrell*, ECF No. 167.) However, an executor has not been substituted for Mr. Nastase in this matter. (*See Merrell*, ECF No. 179, at 2.) The failure by counsel to substitute a representative for the decedent is not a basis for the Court's grant of summary judgment as set forth herein.

[5] Given the lengthy record, the Court cites to the Official Record with both the ECF Nos. *and* the Record Exhibit numbers, where feasible, as follows, (ECF Nos. [ ] – [ ], R. Ex. [ ]). Documents submitted by the parties are always cited with the case name, (*Case Name*, ECF No. [ ], R. Ex. [ ]). To the extent a document has been filed in more than one of these matters, or multiple documents substantiate the same fact or issue, the Court cites only to one filing for brevity.

[6] Plaintiff Thomas J. Crozier, Jr. died on 13 September 2021. (*Strack*, ECF No. 243, ¶ 1.) Pursuant to a motion filed 28 March 2022, the Court ordered that Carolyn B. Crozier, as the Executor of the Estate of Thomas J. Crozier, Jr., be substituted for Thomas J. Crozier, Jr. as Plaintiff. (*Strack*, ECF Nos. 241, 243 at ¶ 3.)

9. The plaintiff in the *Short* matter is Charles D. Short ("Short"). (Am. Compl. ¶ 8, *Short*, ECF No. 11.)

10. The Court refers to the *Merrell*, *Strack*, *Cochrane*, and *Short* plaintiffs herein as "Plaintiffs" when referencing them jointly.

11. Defendant Mike Smith is the co-founder and former CEO of CBB. (Second Am. Compl. ¶ 18, *Strack*, ECF No. 33.)

12. Defendant Jennifer Smith was an employee of CBB and is married to Mike Smith. (Second Am. Compl. ¶ 19, *Strack*, ECF No. 33.)

13. CBB is a privately held North Carolina corporation with its principal office located at 110 Barley Park Lane, Mooresville, NC 28115. (Second Am. Compl. ¶¶ 14, 32, *Merrell*, ECF No. 24.) CBB was originally engaged in beer brewing and bottling, selling its products in grocery stores across North and South Carolina. (*Merrell*, ECF No. 138.56, R. Ex. 67.)

14. Siskey was a financial advisor for many Plaintiffs. (Second Am. Compl. ¶ 46, *Merrell*, ECF No. 24.) He was investigated by the FBI in 2015 and 2016, and it ultimately discovered that five corporate entities incorporated by Siskey were part of a Ponzi scheme operated by him. (Second Am. Compl. ¶¶ 88–91, *Merrell*, ECF No. 24.) The government filed suit against Siskey in December 2016, shortly before he committed suicide on 28 December 2016. (Second Am. Compl. ¶¶ 90–91, *Merrell*, ECF No. 24.)

**B.      Events Leading up to the Plaintiffs' CBB Unit Sales**

15.    CBB filed its Articles of Organization with the North Carolina Secretary of State on 24 September 1997. (Articles of Organization, *Merrell*, ECF No. 138.36, R. Ex. 9.) CBB was organized by Mike Smith and John Stritch, CBB's co-founder and President, as a manager-managed LLC. (*Merrell*, ECF No. 138.36, R. Ex. 9.)

16.    Mike Smith at all times held more than 50% of the membership and voting interest in CBB. (CBB Private Placement Memo 22, *Merrell*, ECF No. 138.56, R. Ex. 67 ["CBB PPM"].) The Membership Interest Transfer Ledger of CBB shows that on 15 September 2000, Mike Smith received 52 units in original issue, and John Stritch received 9 units. (*Merrell*, ECF No. 139.14, R. Ex. Mike-13 ["CBB Unit Ledger"].) Mike Smith owned the 52 units in CBB until the company's merger in 2010.

17.    In 2000, Mike Smith asked Siskey, an insurance salesman and investment advisor, to help him raise capital for CBB. (Dep. James M. Smith 94:12–95:3, 96:17–100:17, *Merrell*, ECF No. 138.2, R. Ex. Smith-1 ["M. Smith Dep."].) Mike Smith and Siskey agreed that Siskey would circulate a Private Placement Memorandum ("PPM") for CBB to introduce potential investors to CBB's business and to its managers, Mike Smith and John Stritch. (*See* M. Smith Dep. 94:20–95:1, 107:3–112:10; CBB PPM 20.) As part of this agreement, Siskey became a member of CBB on 15 September 2000 by purchasing 5 units at a discounted rate. (*Merrell*, ECF No. 156.26, R. Ex. 15; M. Smith. Dep. 97:11–19.) Siskey thereafter sold these units over time. (*See* CBB Unit Ledger 1, 8, 10 (Membership Interest Transfer Ledger

demonstrating that in 2003, some of Siskey's units were redeemed by CBB and the remainder were sold to members of CBB).)

18. The CBB PPM provided that CBB could issue up to 100 units and that one unit was equal to a one percent (1%) membership interest in the company. (CBB PPM 21.) Through the PPM, CBB offered to sell a minimum of 15 units and a maximum of 27.5 units to investors, or between 15% and 27.5% of the company. (CBB PPM, App. VI, 2.)

19. Investment in CBB was limited to Accredited Investors, who attested, as required by the CBB Subscription Agreement, that they could make their own "informed investment decisions," and they had "such knowledge and experience in financial and business matters that he is capable of evaluating the merits and risks of an investment in the company." (CBB Subscription Agreement 3, *Merrell,* ECF No. 138.132, R. Ex. 304 ["Subscription Agt."].) The CBB Subscription Agreement also required investors to certify they received, read, and understood the CBB Operating Agreement and the CBB PPM. (Subscription Agt. 3.) Each Plaintiff did so. (*See, e.g.*, *Cochrane*, ECF No. 148.51, R. Ex. 68; *Strack*, ECF No. 191.105, R. Ex. 195; *Merrell*, ECF Nos. 138.67, R. Ex. 107, 138.92, R. Ex. 233.)

20. Plaintiffs purchased units in CBB between 23 January 2001 and 22 September 2003. (*Merrell*, ECF No. 138.32, R. Ex. Smith-31.) In 2001, the purchase price for one unit of CBB was $100,000 and a half (.5) unit was $50,000. (*Merrell*, ECF No. 138.32, R. Ex. Smith-31.) The price to purchase units changed in subsequent years. (*See, e.g.*, *Merrell*, ECF No. 138.32, R. Ex. Smith-31 (chart containing

information regarding Plaintiffs' unit purchases, distributions, and unit sales, showing, for example, that Kent Kalina purchased a half (.5) unit in 2003 for $54,500).)

21. On 16 December 2003, Siskey sold the last of the units he then owned (.25 units) to Plaintiff Roy Lynam. (*Strack*, ECF No. 191.267, R. Ex. 823; CBB Unit Ledger 10.)

22. The Smiths were married in 2004. (Aff. Jennifer Smith ¶ 16, *Merrell*, ECF No. 140, R. Ex. 2 ["J. Smith Aff."].) Jennifer Smith never purchased units in CBB, nor was she ever a member or manager of CBB. (Aff. Mike Smith ¶ 5, *Merrell*, ECF No. 139, R. Ex. 1 ["M. Smith Aff."]; J. Smith Aff. ¶¶ 3, 12–13.) Rather, Jennifer Smith was a 1099 contract employee paid on an hourly basis, and she worked "as-needed" depending on the projects she was assigned. (J. Smith Aff. ¶¶ 4–5.) Jennifer Smith's primary work for CBB included (1) redesigning CBB's logo and website to reflect its shift away from brewing and bottling company beer brands into a manufacturer for other beverage companies, and (2) assisting with ministerial correspondence to CBB members via mail, email, or phone regarding "reminders and logistics for Company meetings, end-of-year tax forms[,] and occasionally tracking member mailings or responses." (J. Smith Aff. ¶¶ 8–9.)

23. Neither CBB, its managers, nor Jennifer Smith represented to CBB members that Jennifer Smith had any corporate authority. (M. Smith Aff. ¶¶ 21, 31; J. Smith Aff. ¶¶ 10–14.)

## C.    Relevant Provisions of the CBB Operating Agreement

24.     Section 4.1 of the CBB 2000 Operating Agreement[7] (the "Operating Agreement") provided that Mike Smith and John Stritch would be the managers of CBB.  (Am. Restated Operating Agreement of CBB 5, *Merrell*, ECF No. 138.57, R. Ex. 70 ["2000 Op. Agt."].)  Section 4.2 provided that the managers "shall manage and control the business and affairs of the Company to the best of their ability and shall use their best efforts to carry out the purposes of the Company as set forth herein." (2000 Op. Agt. 5.)

25.     There were restrictions on the authority of managers, and CBB members had certain information rights, including the right to access the company's "financial books, records and documents during normal business hours" and to make copies of them upon reasonable notice to CBB.  (2000 Op. Agt. 7, § 4.4, 9–10, § 5.2.)  The Operating Agreement also permitted members to request "information regarding the status of the business and the financial condition of the Company" and "such other information regarding the affairs of the Company as is just and reasonable."  (2000 Op. Agt. 10, § 5.2.)

26.     Further, Section 4.7 of the Operating Agreement provided that "any Member or Manager may engage independently or with others in other business

---

[7] The 2000 Operating Agreement was amended in 2003 and again in 2007.  (*See Merrell*, ECF No. 139.3, R. Ex. Mike-2.)  The only change in the 2003 amendment relevant to the Motions was to change the percentage ownership required to approve a sale of units by a member from unanimous written member approval to 65% written member approval.  (*See Merrell*, ECF No. 139.3, R. Ex. Mike-2.)  Therefore, the Court cites herein to the 2000 Operating Agreement or the 2007 Operating Agreement, unless otherwise referencing the changed language from the 2003 amendment.

ventures of every nature and description even if competitive with the business of the Company." (Am. Restated Operating Agreement of CBB 8, *Merrell*, ECF No. 138.71, R. Ex. 116 ["2007 Am. Op. Agt."]; 2000 Op. Agt. 9.)

**D.      Communication Between Mike Smith and Siskey**

27.      On 11 December 2006, Mike Smith emailed Siskey stating that he was "being approached by an investment group seeking to purchase [CBB]." He further advised Siskey: "I'll keep you posted . . . I'm certainly not in a rush as the best is yet to come for [CBB]. Word on the street is we have the Cap Can deal. This franchise is worth about 6-7 million net profit annually."[8] (*Merrell*, ECF No. 138.39, R. Ex. 24 ["2006 Email"].) In his email to Siskey, Mike Smith did not identify the potential buyer of CBB, indicate any proposed terms, or give the timing for a possible sale of the company. (*See* 2006 Email.) The record is devoid of evidence regarding such information at the time the December 2006 email was sent.

28.      Three months later, on 12 March 2007, Mike Smith and John Stritch sent a letter to CBB members ("March 2007 Letter") informing them of the upcoming annual meeting to be held on 29 March 2007.[9] (*Merrell*, ECF No. 138.61, R. Ex. 94 ["Mar. 2007 Ltr."].) The letter contained updates regarding CBB's financial

---

[8] The Cap Can line was part of an agreement between CBB and Rexam for CBB to install and put into production a new bottling line, the contract for which was signed by Mike Smith on 28 March 2007 and by Rexam on 17 April 2008. (M. Smith Aff. ¶¶ 33(o), 109, *Merrell*, ECF No. 139, R. Ex. 1.)

[9] Jennifer Smith sent an email on 2 March 2007 to the "Partner[s]" of CBB informing them of the 29 March 2007 annual meeting. (*Strack*, ECF No. 191.77, R. Ex. 93.) The email stated that a "formal letter and invitation to the meeting from CEO, [Mike] Smith and President, John Stritch will be coming to you via mail." (*Strack*, ECF No. 191.77, R. Ex. 93.)

performance and noted a two-year sales increase of 400% from $5.6 million in 2005 to $24 million in 2007 due to a new can line, which was being utilized to 100% capacity.[10] (Mar. 2007 Ltr. 1–2; Aff. M. Smith ¶ 33(k) (describing the 2005 company sales).) The letter further informed members that an additional bottling line, the Cap Can line, would be installed in November 2007, which would create a separate revenue stream for the company. (Mar. 2007 Ltr. 2.)

29. On 1 October 2007, Mike Smith and John Stritch sent a letter to CBB members ("October 1 Letter") providing a report on CBB's mid-year performance, an update on building expansion, and an evaluation of next steps for the business. (*Merrell*, ECF No. 138.64, R. Ex. 104 ["Oct. 1 Ltr."].) In relevant part, the letter informed members that net income for the first half of 2007 was $5 million as compared to just over $2 million for the same period in 2006. (Oct. 1 Ltr. 1.) The letter estimated that net income for 2007 would exceed $7 million but that "further distribution of earnings is speculative at best[.]" (Oct. 1 Ltr. 1.) The letter also provided that CBB was expanding its plant at a cost of $4.2 million and investing in new equipment at a price of $6.5 million, $4 million of which was financed by a packaging supplier. (Oct. 1 Ltr. 2.) Finally, the letter stated that CBB would "begin due diligence regarding a potential sale of the company" within the "next twelve months" but that "[a]ny potential sale of the company at this point is truly speculative." (Oct. 1 Ltr. 3.)

---

[10] By 2006, contract packaging work, such as canning and bottling lines, were showing the greatest growth for CBB, with the addition of more can production lines as the company's plan for future growth. (*Merrell*, ECF No. 138.128, R. Ex. 292.)

30. In or around October 2007, Mike Smith made CBB's corporate counsel, Wishart, Norris, Henninger & Pittman P.A. ("Wishart Norris"), aware that Siskey had knowledge of a possible sale of the company and was in the process of purchasing membership interests in CBB from investors who lacked this information. (*Merrell*, ECF No. 138.38, R. Ex. 23 ["Oct. 3 Ltr."].)

31. On 3 October 2007, Wishart Norris hand-delivered a letter to Siskey ("October 3 Letter") warning him that it is unlawful "to omit . . . a material fact in connection with the purchase or sale of any security." (Oct. 3 Ltr. 1.) The letter also warned Siskey that if he had knowledge regarding CBB and "its future plans, including plans to sell[,]" then he must share that knowledge with the CBB members whose units he intended to buy. (Oct. 3 Ltr. 1.) Further, the letter stated that Mike Smith would withhold his consent from transfers of any interests in CBB until "all members of the company" were made aware of management's plans. (Oct. 3 Ltr. 2.) The letter stated that the firm and Mike Smith "believe that this action is prudent given the possible liability that may be incurred . . . if any more sales of interests occur without all parties having knowledge of all the relevant information." (Oct. 3 Ltr. 2.)

32. Following the October 1 and 3 Letters, CBB did not authorize any agreements to sell CBB units until 15 October 2007. (*See Strack*, ECF Nos. 191.131, R. Ex. 266, 191.247, R. Ex. 696; *Merrell*, ECF No. 138.55, R. Ex. 66.) None of the Plaintiffs sold their CBB units to Siskey prior to his receipt of the October 3 Letter.

33.     Plaintiffs thereafter sold their CBB units to Siskey between 15 October 2007 and 27 March 2008.  (*See, e.g.*, *Strack*, ECF Nos. 191.131, R. Ex. 266, 191.224, R. Ex. 531, 191.247, R. Ex. 696; *Merrell*, ECF No. 138.55, R. Ex. 66.)

E.      **Amendments to the CBB Operating Agreement and Plaintiffs' Unit Sales**

34.     While the CBB Operating Agreement provided two methods for members to sell their units, Plaintiffs sold their units to Siskey using the "Consent" method, pursuant to Sections 7.1(c)(i) and 7.1(e) of the Operating Agreement.  (2000 Op. Agt. 16–18.)  The Consent method permitted members to transfer units to an individual with the "prior written consent" of members holding, in the aggregate, at least 65% of the percentage interest held by all CBB members.  (2000 Op. Agt. § 7.1(c)(i); *see also Cochrane*, ECF No. 166.29, R. Ex. 542 (demonstrating the change from unanimous approval to 65% approval).)  Members giving approval for such transfers signed Consent to Transfer of Membership Interest documents ("Consent Agreements"), while the members selling their unit(s) signed an Assignment and Purchase Agreement ("APA(s)") that demonstrated assent to the transaction and named the purchaser.  (*See, e.g.*, *Strack*, ECF No. 191.247, R. Ex. 696 (showing Pamela Boileau's executed APA).)

35.     Eleven plaintiffs sold their CBB units to Siskey between 15 October 2007 and 13 December 2007: James Wilson, Carl Merrell, Pamela Boileau, Jeffrey and Penny Strack, Kent Kalina, Carolyn Crozier, Thomas J. Crozier, Jr., Ralph N.

Cochrane,[11] and Roy Lynam. (*Strack*, ECF Nos. 191.67, 191.131, 191.185, 191.187, 191.203–204, 191.247, 191.269; *Merrell*, ECF No. 138.107; *Cochrane*, ECF No. 148.124.)

36. Amendments to the CBB Operating Agreement were proposed by Mike Smith and John Stritch on 26 October 2007. (2007 Am. Op. Agt. 30.) A letter sent by CBB on 27 October 2007 informed its members of the proposed changes to the Operating Agreement. (*Merrell*, ECF No. 138.70, R. Ex. 115 ["Oct. 27 Ltr."].) Of relevance here, the proposed amendments would allow majority rather than unanimous member approval to amend the Operating Agreement, and majority rather than 65% member approval to properly permit the sale of a member's ownership units. (Oct. 27 Ltr.; 2007 Am. Op. Agt. 14, § 7.1(c)(i).)

37. The required unanimous member approval was obtained for the 2007 amendments on 18 December 2007, and the amendments were effective as to all unit transfers, or other member activity, on and after that date. (Written Consent 2, *Merrell*, ECF No. 138.97, R. Ex. 243; All Written Consents, *Merrell*, ECF No. 138.104, R. Ex. 256.)

38. The remaining nine plaintiffs sold their units to Siskey *after* the 2007 amendments became effective: Mallory Johnson, Robert Nastase, Rita Dilling, Lyle and Jeanette Ranson, Craig and Wanda Miller, Charles Short, and Dallas Pendry,

---

[11] Following the sale of his units, Thomas J. Crozier Jr. died, and his wife Carolyn Crozier was substituted as the executor of his estate. In addition, Mr. Cochrane died after the sale of his units and his sons Jeff Cochrane and Gary Cochrane were named executors of his estate.

Jr. (*Strack*, ECF Nos. 191.75, 191.224, 191.229; *Merrell*, ECF Nos. 138.58, 138.109–110, 138.184; *Short*, ECF No. 36.85.)

39. No Plaintiff contacted the Smiths prior to selling their units to Siskey, except for Dallas Pendry, Jr.[12] On one occasion, Dallas Pendry called CBB requesting "information about earnings distribution[.]" (M. Smith Dep. 74:21–75:3.) Mr. Pendry

---

[12] Jennifer Smith affirmed that she never spoke to nor recalls any substantive conversation with any Plaintiff. She "was never authorized to communicate substantively with CBB members nor did [she] ever do so." (J. Smith Aff. ¶ 11; *see also* Dep. Jeanette Ranson 18:14–19:19, *Merrell*, ECF No. 138.18, R. Ex. Smith-17 ["J. Ranson Dep."].) Moreover, the record contains numerous instances of similar testimony indicating plaintiffs did not rely on the advice of the Smiths. For example:

Jeanette Ranson, when asked if she considered asking Mike Smith, Jennifer Smith, or CBB for any information that might guide her decision to sell her units, testified "No." (J. Ranson Dep. 20:24–21:12.) Regarding both Ms. Ranson and her husband Lyle Ranson's decisions to sell, Ms. Ranson stated that she, her husband, and Siskey helped determine her decision to sell her membership interest in CBB. (J. Ranson Dep. 21:25–22:10.)

Wanda Miller testified that she spoke to Mike Smith at some point when she was a member of CBB but could not remember when or what about. (Dep. Wanda Miller 21:13–23:1, *Merrell*, ECF No. 138.15, R. Ex. Smith-14 ["W. Miller Dep."].) Ms. Miller never met Jennifer Smith, nor did they ever speak to one another, but Ms. Miller saw Jennifer Smith once while at the Speedway Club in Charlotte, North Carolina. (W. Miller Dep. 23:2–24:1.)

Short testified that he did not recall any conversations with Jennifer Smith about the business of CBB, nor did he ever ask the Smiths or anyone else about the contents of the October 1 Letter prior to selling his units. (Dep. Charles David Short 76:3–6, 106:23–107:18, *Merrell*, ECF No. 138.20, R. Ex Smith-19 ["Short Dep."].) Instead, Short stated that he was relying on "information about the [CBB] investment" provided to him by Siskey. (Short Dep. 107:12–18.) When Short decided to sell his CBB units, he did not ask for any information from the Smiths, or CBB. (Short Dep. 141:15–142:1.) In fact, Short, like many Plaintiffs, had never met nor spoken with Jennifer Smith. (Short Dep. 143:24–144:4.)

Examples of similar testimony by Plaintiffs are numerous. (*See also* Dep. Jeffrey Strack 79:3–21, *Merrell*, ECF No. 138.21, R. Ex. Smith-20 (stating he never met the Smiths, never communicated with them via email or another indirect means, and had "no personal knowledge of any oral statements they made about [CBB]"); Dep. Robert J. Nastase 113:2–13, *Merrell*, ECF No. 138.16, R. Ex. Smith-15 (stating that he never spoke to the Smiths, and "I don't know them at all").)

stated at his deposition that he called CBB before he sold his shares, and that he received a call back with information, but that he did not follow up with additional questions. (Dep. Dallas Pendry, Jr. 200:10–203:4, *Merrell*, ECF No. 138.17, R. Ex. Smith-16.)

40. Siskey purchased a total of 12.75 units from Plaintiffs between 15 October 2007 and 27 March 2008 for approximately $3,180,000.00. (*Merrell*, ECF No. 138.32, R. Ex. Smith-31; *see* CBB Unit Ledger.)

**F.    The Ultimate Sale of CBB**

41. Almost three years after Plaintiffs sold their units to Siskey, on 27 May 2010, CBB entered into an Agreement and Plan of Merger which resulted in a substantial restructuring of CBB, effectively merging CBB with Southern Belle Merger Sub, LLC on 6 August 2010. (M. Smith Aff. ¶¶ 129–30, 133.) The transaction produced significant payments to CBB members. In exchange for surrendering their units, members received a pro rata share of the merger consideration and dividends. (M. Smith Aff. ¶¶ 129(e), 133.)

42. As a result of his ownership, Siskey received approximately $22,158,642.18 from CBB between 2009 and 2013.[13] (*See* Second Am. Compl. ¶ 132, *Strack*, ECF No. 33.)

---

[13] In addition to his purchases from Plaintiffs, Siskey purchased an additional 3 units. As a result, at the time of the merger Siskey owned a total of 15.75 units of CBB. (*See* CBB Unit Ledger.)

### G. Procedural History

43. The procedural history relevant to the Motions is set forth in this Court's 13 December 2022 Order and Opinion in *Merrell v. Smith*, which is incorporated herein by reference. *See Merrell*, 2022 NCBC LEXIS 155, at **14–15. Simply put, after the completion of extensive discovery, pursuant to the Court's Case Management Orders, the Smiths filed the Motions.

44. Following full briefing, the Court held a hearing on the Motions and related motions on 25 and 26 August 2022 (the "Hearing"), at which all parties to the Motions were present and represented by counsel.

45. The Motions are ripe for resolution.

### III. LEGAL STANDARD

46. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C.G.S. § 1A-1, Rule 56(c). "A 'genuine issue' is one that can be maintained by substantial evidence." *Dobson v. Harris*, 352 N.C. 77, 83 (2000). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion and means more than a scintilla or a permissible inference[.]" *DeWitt v. Eveready Battery Co.*, 355 N.C. 672, 681 (2002) (cleaned up).

47. The moving party "bears the initial burden of demonstrating the absence of a genuine issue of material fact." *Liberty Mut. Ins. Co. v. Pennington*, 356 N.C. 571,

579 (2002). The movant may make the required showing by proving that "an essential element of the opposing party's claim does not exist, cannot be proven at trial, or would be barred by an affirmative defense, or by showing through discovery that the opposing party cannot produce evidence to support an essential element of her claim." *Dobson*, 352 N.C. at 83 (citations omitted).

48. "Once the party seeking summary judgment makes the required showing, the burden shifts to the nonmoving party to produce a forecast of evidence demonstrating specific facts, as opposed to allegations, showing that he can at least establish a *prima facie* case at trial." *Gaunt v. Pittaway*, 139 N.C. App. 778, 784–85 (2000).

49. The Court must view the evidence in the light most favorable to the nonmovant. *Dobson*, 352 N.C. at 83. However, the nonmovant

> may not rest upon the mere allegations or denials of their pleading, but their response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If [the nonmovant] does not so respond, summary judgment, if appropriate, shall be entered against [the nonmovant].

N.C.G.S. § 1A-1, Rule 56(e).

## IV. ANALYSIS

50. The Smiths argue that summary judgment is proper against Plaintiffs on all remaining claims: (1) breach of fiduciary duty; (2) fraud by omission and concealment; (3) fraud in the inducement; (4) constructive fraud; (5) negligent misrepresentation; (6) North Carolina securities fraud; and (7) civil conspiracy.

51.     Plaintiffs allege that Mike Smith provided Siskey with insider information in the December 2006 email, which disclosed to Siskey but not Plaintiffs that at least one interested buyer approached CBB seeking to purchase it.  Plaintiffs, many of whom were Siskey's investment clients, allege that Siskey sought to purchase their units in CBB because of this insider information.  Siskey allegedly convinced each of them to sell their CBB units by intentionally omitting the inside information so that he could profit from the impending sale of CBB.  Further, Plaintiffs allege that the Smiths assisted Siskey by facilitating the Plaintiffs' unit sales and approving those transactions.

## A.      Breach of Fiduciary Duty

52.     The Smiths argue that Plaintiffs' claims for breach of fiduciary duty fail because neither Mike Smith nor Jennifer Smith owed them any fiduciary duty. (Mots. 1–2, *Merrell*, ECF No. 141 ["Mots."].)  The Smiths also argue that these claims fail because Plaintiffs cannot demonstrate that, but for the Smiths' conduct, they would not have sold their interest in CBB.  (Br. Supp. Mots. 31–32, *Merrell*, ECF No. 142 ["Br. Supp. Mots."].)  CBB disclosed the relevant facts regarding its plans to sell the company, and CBB's profits in the October 1 Letter, but Plaintiffs ultimately chose to sell their units for reasons unrelated to the information disclosed in the October 1 Letter, including concerns about CBB's debt from the installation of a new canning line, and the prospects of CBB.  (Br. Supp. Mots. 32.)

53.     "To establish a claim for breach of fiduciary duty, a plaintiff must show that: (1) the defendant owed the plaintiff a fiduciary duty; (2) the defendant breached that

fiduciary duty; and (3) the breach of fiduciary duty was a proximate cause of injury to the plaintiff." *Sykes v. Health Network Sols., Inc.*, 372 N.C. 326, 339 (2019).

### 1. Mike Smith

54. As a preliminary matter, Plaintiffs do not allege that Mike Smith's status as a manager of CBB gives rise to any fiduciary duty to other members, nor do Plaintiffs allege or properly plead a breach of fiduciary duty to the company through a derivative action. (*See Strack*, ECF No. 33; *Merrell*, ECF No. 24; *Cochrane*, ECF No. 7; *Short*, ECF No. 11.) However, in response to the Motions, Plaintiffs now argue that as a manager of CBB Mike Smith had control over CBB pursuant to Section 4.2 of the Operating Agreement and therefore owed Plaintiffs fiduciary duties. (*See* Pls. Resp. Mots. 3, *Merrell*, ECF No. 161 ["Opp'n Br."].)

55. "[M]anagers of a limited liability company . . . owe a fiduciary duty to the company, and not to individual members." *Kaplan v. O.K. Techs., L.L.C.*, 196 N.C. App. 469, 474 (2009). " '[W]here it is alleged that managers have breached [their fiduciary] duty, the action is properly maintained *by the LLC* rather than any individual member.' " *Barefoot v. Barefoot*, 2022 NCBC LEXIS 8, at \*\*24 (N.C. Super. Ct. Feb. 2, 2022) (quoting *Kaplan*, 196 N.C. App. at 474) (cleaned up). There are no derivative claims for breach of fiduciary duty by Mike Smith for harm to CBB, and therefore, to the extent Plaintiffs claim a breach of fiduciary duty on that basis, those claims are DISMISSED.

56. Next, Plaintiffs argue that as the majority member of CBB, Mike Smith owed them a fiduciary duty, which he breached. (Opp'n Br. 9–10.) "The North

Carolina Limited Liability Company Act does not create fiduciary duties among members. As a general rule, members of a limited liability company are like shareholders in a corporation in that members do not owe a fiduciary duty to each other or to the company." *Emrich Enters. v. Hornwood, Inc.*, 2022 NCBC LEXIS 19, at **42 (N.C. Super. Ct. Feb. 15, 2022) (cleaned up). Rather, " '[t]he rights and duties of LLC members are ordinarily governed by the company's operating agreement, not by general principles of fiduciary relationships.' " *Id.* (quoting *Strategic Mgmt. Decisions v. Sales Performance Int'l*, 2017 NCBC LEXIS 69, at *10–11 (N.C. Super. Ct. Aug. 7, 2017)).

57. However, in some circumstances, "a holder of a majority interest who exercises control over the LLC owes a fiduciary duty to minority interest members." *Vanguard Pai Lung, LLC v. Moody*, 2019 NCBC LEXIS 39, at *17 (N.C. Super. Ct. June 19, 2019) (citations omitted). This Court in *Vanguard* specified several actions which, if taken by a majority member, indicate an exercise of control potentially sufficient to create a fiduciary duty, including: (1) managerial control over a board of directors or other managers; (2) the ability to dissolve the company; (3) the ability to declare bankruptcy; and (4) the ability to amend the operating agreement without approval from other members. *Id.* at *19–21. The exercise of control through any of these actions weigh in favor of the majority member owing minority members a fiduciary duty. *Id.* at *21. "Thus, when the operating agreement confers controlling authority on the majority member, [the majority member] owes a duty not to use [his] control to harm the minority, assuming no other provision disclaims such a duty." *Id.*

58. " 'The scope of this exception [to the general proposition that members of an LLC owe no fiduciary duties to other members], borrowed from precedents governing corporations, remains unsettled' and 'this Court has cautioned against a broad application because of the fundamental differences between LLCs and corporations.' " *Bennett v. Bennett*, 2019 NCBC LEXIS 19, at *19 (N.C. Super. Ct. Mar. 15, 2019) (quoting *Strategic Mgmt. Decisions*, 2017 NCBC LEXIS 69, at *11). Courts have routinely refused to extend precedents borrowed from corporations to LLCs because minority members have a much greater ability to negotiate for protections in the operating agreement. *See, e.g.*, *Bennett*, 2019 NCBC LEXIS 19, at *20; *Fiske v. Kieffer*, 2016 NCBC LEXIS 22, at *10 (N.C. Super. Ct. Mar. 9, 2016); *Island Beyond, LLC*, 2013 NCBC LEXIS 48, at *15. "[O]nly when one party figuratively holds all the cards -- all the financial power or technical information, for example -- have North Carolina courts found that the special circumstance of a fiduciary relationship has arisen." *Kaplan*, 196 N.C. App. at 475.

59. The Smiths contend that Mike Smith did not owe fiduciary duties to the Plaintiffs, arguing that prior to the 2007 Operating Agreement, he had no actual control because he could not act unilaterally or contravene the Operating Agreement. (Br. Supp. Mots. 13–14.) Further, even after the 2007 Operating Agreement became effective, the Smiths argue that Mike Smith could not have been a fiduciary because he could neither act unilaterally regarding "information dissemination," nor act unilaterally to effect unit transfers since those required the cooperation and approval of Plaintiffs to complete the Consent Agreements and APAs. (Br. Supp. Mots. 14.)

### i. Plaintiffs' Sales Before the 2007 Amendments

60.     Under the 2003 amendments to the 2000 Operating Agreement, the Court concludes based on the uncontradicted evidence of record that Mike Smith did not have control over CBB. First, Mike Smith did not dominate CBB's other manager, John Stritch, as the Operating Agreement restricted the authority of its managers, requiring certain actions to have either (1) unanimous member approval, or (2) 75% member approval. Further, each manager was permitted to take the same actions listed under Section 4.2 of the Operating Agreement—neither had more control than the other. The record also indicates CBB did not have a board of directors.[14] Finally, Mike Smith did not have the exclusive ability to dissolve the company, (*see* 2000 Op. Agt. 11, § 6.1), and he did not have the ability to unilaterally amend the Operating Agreement, as unanimous approval from CBB members was required, (*see* 2000 Op. Agt. § 9.9).[15]

61.     While Mike Smith was the majority member of CBB when the first eleven Plaintiffs sold their units, he did not hold all the financial power or technical information of CBB, and in fact Plaintiffs were able to access CBB's financial books, records, and documents, as well as make copies of those documents, so long as

---

[14] The record indicates that CBB had an executive committee with at least a CEO, President, and Vice President. (Dep. Shannon Marie Hilton 40:16–41:21, *Merrell*, ECF No. 159.4, Pls.' Index Ex. 13.) The record also indicates that Mike Smith was the Chief Executive Officer of CBB, and John Stritch was President. However, the record does not mention a board of directors, who those directors were, bylaws, if there were meetings of a board, or if there were meeting minutes. Thus, the evidence in the record is insufficient to create a genuine issue of material fact on whether there was a board of directors of CBB.

[15] The CBB Operating Agreement did not address the ability to declare bankruptcy.

reasonable notice was given to the company. (2000 Op. Agt. 7, § 4.4, 9–10, § 5.2.) In addition, Mike Smith did not have the exclusive ability to permit Plaintiffs to sell their ownership interests in CBB—not only did each Plaintiff have to execute their APA's, but Mike Smith also could not unilaterally execute the Consent Agreements because 65% written member approval was required.

62.     Prior to the effective date of the 2007 Operating Agreement, Mike Smith, as the majority member, could not exercise control over CBB members under any of the *Vanguard* factors, and he did not unilaterally approve the first group of plaintiffs' unit sales. The uncontested evidence shows that Mike Smith did not owe a fiduciary duty to those Plaintiffs who sold prior to the effective date of the 2007 Operating Agreement.

63.     Therefore, the Court concludes that plaintiffs James Wilson, Carl Merrell, Pamela Boileau, Jeffrey and Penny Strack, Kent Kalina, Carolyn Crozier, individually and as the executor of the Estate of Thomas J. Crozier, Jr., Jeff Cochrane and Gary Cochrane, as administrators of the Estate of Ralph N. Cochrane, and Roy Lynam's claims for breach of fiduciary duty fail as a matter of law, and their claims for breach of fiduciary duty are hereby DISMISSED.

### ii.  Plaintiffs' Sales After the 2007 Amendments

64.     After the 2007 Operating Agreement was approved and effective, Mike Smith could unilaterally approve Plaintiffs' unit sales as the sole signatory on the Consent Agreements, and he could act alone to amend the Operating Agreement. However, the plain language of Section 4.7 provided that "any Member or Manager

may engage independently or with others in other business ventures of every nature and description even if competitive with the business of the Company." (2007 Am. Op. Agt. 8.) The language of Section 4.7 is evidence that members of CBB did not owe the company a fiduciary duty of loyalty, and the Operating Agreement did not otherwise provide for any fiduciary or fiduciary-like duties among members and, in fact, is reasonably interpreted to renounce such duties. *See Bennett*, 2019 NCBC LEXIS 19, at *16–17 (where provisions in the operating agreement "disclaim fiduciary or fiduciary-like duties on the part of members or managers[,]" it is evidence supporting a conclusion that no fiduciary duties were owed).

65.    Even if Mike Smith owed fiduciary duties to the later selling plaintiffs, Plaintiffs have not come forward with substantial evidence to show that Mike Smith breached any fiduciary duty.

66.    Plaintiffs contend Mike Smith breached his fiduciary duty by: (1) omitting known facts concerning the sale of CBB and providing inside information regarding that sale to Siskey; and (2) ratifying Plaintiffs' unit sales to Siskey after allegedly enabling those transactions. (Second Am. Compl. ¶ 359, *Strack*, ECF No. 33.)

67.    First, each Plaintiff as a member of CBB had the authority to negotiate for protections in the CBB Operating Agreement. Each Plaintiff who specifically ratified the 2007 amendments thereby approved the sale of CBB units with only 51% member approval, if using the Consent method. Mike Smith, who at all times held 52 units in CBB, was thereafter permitted to unilaterally approve unit sales, given his 52% ownership. Therefore, the argument that Mike Smith breached a fiduciary duty owed

to Plaintiffs simply by performing an act which complied with the CBB Operating Agreement is insufficient to create a jury issue as to this point. Plaintiffs ratified the 2007 amendments, thereby negotiating away their protections under the Operating Agreement. Further, Plaintiffs have cited no evidence indicating an agreement between Mike Smith and Siskey sufficient to establish a conspiracy. (*See infra* Part IV.G.) Thus, Plaintiffs' contention that Mike Smith breached a fiduciary duty owed to them by ratifying the Plaintiffs' unit sales to Siskey necessarily fails.

68. Plaintiffs' remaining contention is that Mike Smith breached his fiduciary duty by omitting known material facts concerning the sale of CBB but shared that information with Siskey, which proximately caused Plaintiffs to sell their units.

69. "An omitted fact is material if there is a substantial likelihood that a reasonable [member] would consider it important in deciding how to vote." *Ehrenhaus v. Baker*, 216 N.C. App. 59, 88 (2011) (citations omitted). Under this standard, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id.* (citations omitted).

70. The record is clear that a possible sale of CBB was disclosed to Plaintiffs in the October 1 Letter prior to the sale of any Plaintiffs' units to Siskey. As a result, if there was any omission of information by Mike Smith to Plaintiffs, Mike Smith complied with any fiduciary duty he may have owed them by ultimately disclosing this information prior to the sale by Plaintiffs of their CBB unit(s) to Siskey.

71. Further, the information allegedly omitted by Mike Smith was immaterial to Plaintiffs' decisions to sell their units.[16] There is uncontradicted evidence that Plaintiffs relied on statements made by Siskey, not by Mike Smith, in choosing to sell their units. (*See supra* note 12.) Rather, the substantial evidence indicates many Plaintiffs do not recall asking the Smiths or anyone else about the contents of the October 1 Letter prior to selling their units.

72. The nine plaintiffs who sold under the 2007 Operating Agreement knew or reasonably should have known CBB was beginning to pursue a potential sale, given that over two months had passed since the October 1 Letter was sent. If this information was material to Plaintiffs' decision to sell, they each had ample opportunity to ask Mike Smith, or other agents of CBB, about the potential sale or the contents of the October 1 Letter but did not do so.

73. Mere general interest expressed to Mike Smith by an unidentified potential purchaser, without specifics as to possible terms of a transaction, is not the type of information that must necessarily be disclosed by CBB management to all members.

---

[16] As to the information in the December 2006 email to Siskey, there is no record evidence before the Court of *who* the investment group was, or that any "approach" turned into an offer to purchase CBB at any time between 11 December 2006 and January 2009. (*See* M. Smith Aff. ¶¶ 111, 117.) Rather, the record before the Court shows that there was no pending sale in 2007 and 2008, but that CBB engaged an investment banking firm which drafted a confidential information memorandum used to market CBB for sale in late 2008. (M. Smith Aff. ¶¶ 111, 113, 115.)

The CBB sale process was stopped in or around January 2009 and resumed in September 2009 when CBB updated the confidential information memorandum, and thereafter received its first interested buyers. (M. Smith Aff. ¶ 127.) Therefore, the uncontradicted evidence shows that the December 2006 email was wholly immaterial, given that it was speculative information at a time where no buyer was identified. The record indicates there was no "pending sale" of CBB in 2007 and 2008 because "no buyer had made any indication of any intention to even discuss a purchase of CBB[.]" (M. Smith Aff. ¶ 111.)

To the extent such information should have been disclosed, the October 1 Letter to all members provided concrete information that CBB was moving toward a sale of the company, which belies Plaintiffs' argument that Mike Smith attempted to control CBB in a manner harmful to members. *See Finkel v. Palm Park, Inc.*, 2019 NCBC LEXIS 38, at *29 (N.C. Super. Ct. June 11, 2019) ("[E]vidence of financial transparency strongly belies any contention that [defendant] attempted to dominate or control [plaintiff]."); *see also Lockerman v. S. River Elec. Membership Corp.*, 250 N.C. App. 631, 639 (2016) (holding no dominion and control because plaintiffs were sufficiently on notice regarding the information at issue, *and* that information was available to plaintiffs at any time). Rather, Mike Smith's disclosure is indicative of his transparency with members. *See Finkel*, 2019 NCBC LEXIS 38, at *29.

74. The Court concludes, therefore, that even if Mike Smith owed Plaintiffs a fiduciary duty, Plaintiffs have failed to show Mike Smith breached that duty or that, if he did breach a duty, it proximately caused Plaintiffs an injury. Accordingly, the Court concludes that the Motions, with respect to plaintiffs Mallory Johnson, Robert Nastase, Rita Dilling, Lyle and Jeanette Ranson, Craig and Wanda Miller, Charles D. Short, and Dallas Pendry, Jr.'s claims for breach of fiduciary duty against Mike Smith, should be and therefore are GRANTED. As a result, Plaintiffs' claims against Mike Smith for breach of fiduciary duty are hereby DISMISSED.

### 2. Jennifer Smith

75. The broad parameters of fiduciary duties have been "specifically limited in the context of employment situations." *Dalton v. Camp*, 353 N.C. 647, 652 (2001).

"Where an employee is neither an officer nor a director, extraordinary circumstances are necessary to impose a fiduciary duty arising out of the employment relationship." *Se. Air Charter, Inc. v. Stroud*, 2015 NCBC LEXIS 82, at *16 (N.C. Super. Ct. Aug. 17, 2015) (citing *Dalton*, 353 N.C. at 652). These "extraordinary circumstances" occur when "the employer [is] subjugated to the improper influences or domination of his employee[.]" *Dalton*, 353 N.C. at 652; *consider Sunbelt Rentals, Inc. v. Head & Engquist Equip., L.L.C.*, 2002 NCBC LEXIS 2, at **22 (N.C. Super. Ct. July 10, 2002) (finding no fiduciary duty because employee's "substantial discretion with respect to the day-to-day, 'nuts and bolts' operation" did not constitute domination and influence over employer), *and Austin Maint. Constr., Inc. v. Crowder Constr. Co.*, 224 N.C. App. 401, 410 (2012) (finding no fiduciary duty because "any confidence that [p]laintiff reposed in [employee] consisted of nothing more than relying on him to competently perform his assigned duties.").

76. Here, the undisputed evidence demonstrates that Jennifer Smith was never a member of CBB, nor was she a manager, officer, or director. Jennifer Smith was a contract employee whose interactions with the Plaintiffs were routine and ministerial. (J. Smith Aff. ¶¶ 7–9.) The undisputed evidence also indicates that CBB did not represent to members that Jennifer Smith had any corporate authority, nor is there evidence to suggest that she exerted any improper influence or domination on CBB. Rather, the record is clear that Jennifer Smith's authority was limited to the ministerial tasks which CBB relied on her to complete competently. The fact that she at times sent emails to members regarding the date of an annual meeting, for

example, is unremarkable given that it was an administrative task assigned as one of her regular duties.

77.    Therefore, the Court concludes that Jennifer Smith, as an employee, did not owe the Plaintiffs, as members of CBB, a fiduciary relationship.  Accordingly, the Motions are GRANTED as to Plaintiffs' breach of fiduciary duty claims against Jennifer Smith and therefore those claims are DISMISSED.

B.    **Fraud by Omission and Concealment**

78.    "Where a fraud claim arises by concealment or nondisclosure of material facts, a plaintiff must allege that the defendant(s) 'had a duty to disclose material information to [plaintiff], as silence is fraudulent only when there is a duty to speak.'" *Aldridge v. Metro. Life Ins. Co.*, 2019 NCBC LEXIS 116, at *102 (N.C. Super. Ct. Dec. 31, 2019) (quoting *Lawrence v. UMLIC-Five Corp.*, 2007 NCBC LEXIS 20, at *8 (N.C. Super. Ct. June 18, 2007)).

79.    Fraud claims based on omission(s) require a plaintiff to show:

> (1) the relationship between plaintiff and defendant giving rise to the duty to speak; (2) the event that triggered the duty to speak or the general time period over which the relationship arose and the fraud occurred; (3) the general content of the information that was withheld and the reason for its materiality; (4) the identity of those under a duty who failed to make such disclosures; (5) what the defendant gained from withholding the information; (6) why the plaintiff's reliance on the omission was reasonable and detrimental; and (7) the damages the fraud caused the plaintiff.

*Lee v. McDowell*, 2020 NCBC LEXIS 121, at *20–21 (N.C. Super. Ct. Oct. 14, 2020) (citing *Island Beyond*, 2013 NCBC LEXIS 48, at *18–19) (internal marks omitted).

80.    A duty to disclose arises in three situations:

(1) there is a fiduciary relationship between the parties to the transaction; (2) a party has taken affirmative steps to conceal material facts from the other; or (3) one party has knowledge of a latent defect in the subject matter of the negotiations about which the other party is both ignorant and unable to discover through reasonable diligence.

*Aldridge*, 2019 NCBC LEXIS 116, at *103 (internal marks omitted); *see also Harton v. Harton*, 81 N.C. App. 295, 298 (1986) ("The two remaining situations in which a duty to disclose exists arise outside a fiduciary relationship, when the parties are negotiating at arm's length"). Even in the absence of a duty to speak, "it is well-established that once a party *chooses to speak*, that party then 'has a duty to make a full and fair disclosure of facts concerning the matters on which he chooses to speak.'" *Aldridge*, 2019 NCBC LEXIS 116, at *103 (citing *Ragsdale v. Kennedy*, 286 N.C. 130, 139 (1974)) (emphasis in original).

### 1. Jennifer Smith

81. Plaintiffs allege Jennifer Smith was "aware" of Siskey's "fraudulent purchases" and that she was "in a position to communicate the information to the Plaintiffs and owed the Plaintiffs a duty to do so." (Second Am. Compl. ¶ 385, *Strack*, ECF No. 33.) Plaintiffs argue this gave rise to a duty to disclose.

82. Based on the allegations in their complaints, the Court concludes Plaintiffs believe Jennifer Smith had a duty to disclose because she "has taken affirmative steps to conceal material facts from the[m.]"[17] *Aldridge*, 2019 NCBC LEXIS 116, at *103

---

[17] Even if Plaintiffs attempted to argue that Jennifer Smith owed them a fiduciary duty, and therefore she owed them a duty to disclose, the Court has concluded that as an employee Jennifer Smith did not owe members of CBB a fiduciary relationship. Therefore, such an argument would fail for the same reason Plaintiffs' breach of fiduciary duty claims fail as to Jennifer Smith.

(internal marks omitted). However, Plaintiffs have failed to forecast any evidence demonstrating that Jennifer Smith, a CBB employee and non-member, knew about Siskey's intent to purchase Plaintiffs' membership units or that Siskey failed to provide relevant information to Plaintiffs. Further, this argument necessarily fails because Plaintiffs and Jennifer Smith were not engaging in a negotiation such that any affirmative steps to conceal material information could have been taken. *See Harton*, 81 N.C. App. at 298.

83. Therefore, the Court concludes that Jennifer Smith did not owe the Plaintiffs a duty to disclose. Accordingly, Plaintiffs' claims for fraud by omission and concealment against Jennifer Smith are DISMISSED.

### 2. Mike Smith

84. Plaintiffs allege Mike Smith owed them a fiduciary duty as "the majority controlling shareholder" of CBB, that he was allegedly "responsible for officially executing the fraudulent transfers" to Siskey, and therefore "in fact held all the cards to allow the transfers to take place." (Second Am. Compl. ¶ 384, *Strack*, ECF No. 33.) Plaintiffs argue this set of facts gave rise to a duty to disclose.

85. The Court has concluded that some Plaintiffs' claims for breach of fiduciary duty fail as a matter of law. Therefore, any claims for fraud by omission and concealment based on that underlying duty also fail. (*See supra* ¶¶ 54–63.)

86. Plaintiffs' claims for fraud by omission and concealment also fail because Plaintiffs have not come forth with evidence of an omission or, if there was an omission, any evidence of that omission's materiality. In response to the Motions,

Plaintiffs argue that the Smiths provided Siskey with information about CBB which was not shared with Plaintiffs, and that such information prompted Siskey to purchase the Plaintiffs' ownership interests. (Opp'n Br. 11.) However, in making this argument, Plaintiffs make no citation to the record, and instead indicate that alleged inside information was provided to Siskey, without stating *what* that information was. (Opp'n Br. 11.)

87. Plaintiffs allege in their complaints that Mike Smith's December 2006 email to Siskey stating that he was "approached by an investment group seeking to purchase [CBB]" was a material fact that Mike Smith had a duty to inform Plaintiffs of, including any other information provided to Siskey, before processing their unit sale documents. (Second Am. Compl. ¶¶ 388–89, *Strack*, ECF No. 33.) Plaintiffs argue this information was "affirmatively concealed" by the Smiths. (Second Am. Compl. ¶ 390, *Strack*, ECF No. 33.)

88. The undisputed evidence before the Court, however, shows that Mike Smith disclosed *and* discussed the subject of CBB's potential sale in the October 1 Letter. The letter provided that CBB was beginning "due diligence regarding a potential sale of the company" within the "next twelve months[.]" (Oct. 1 Ltr. 3.) Plaintiffs have failed to identify any evidence in the record showing other material information Mike Smith may have disclosed to Siskey, or other material information Siskey received from Mike Smith that Plaintiffs did not receive. (*See supra* note 16 (discussing the December 2006 email and its lack of materiality to Plaintiffs' decisions to sell their CBB units).)

89. Because Plaintiffs have failed to demonstrate the omission by Mike Smith of a material fact, the Court need not address additional arguments raised by the parties. Defendants have met their burden of demonstrating that proof of an essential element of this claim is missing, and Plaintiffs have failed to come forward with evidence demonstrating that a genuine issue of material fact remains for trial. Accordingly, Plaintiffs' fraud by omission and concealment claims against Mike Smith are DISMISSED.

## C. <u>Fraud in the Inducement</u>

90. " 'The essential elements of fraud [in the inducement] are: (1) [a f]alse representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party.' " *Media Network, Inc. v. Long Haymes Carr, Inc.*, 197 N.C. App. 433, 453 (2009) (quoting *Rowan Cty. Bd. of Educ. v. U.S. Gypsum Co.*, 332 N.C. 1, 17 (1992)). "[A]ny reliance on alleged false representations must be reasonable. Reliance is not reasonable where the plaintiff could have discovered the truth of the matter through reasonable diligence, but failed to investigate." *Cobb v. Pa. Life Ins. Co.*, 215 N.C. App. 268, 277 (2011) (citations omitted).

91. Here, Plaintiffs allege that the Smiths concealed material information by (1) failing to inform them that an investment group was seeking to purchase CBB, and (2) failing to disclose ongoing negotiations concerning a possible deal with Red Bull. (*See* Second Am. Compl. ¶¶ 412–14, *Strack*, ECF No. 33.)

92.     However, Mike Smith disclosed substantially the same information to both Siskey and Plaintiffs.  The December 2006 email from Mike Smith to Siskey stated merely that he was "being approached by an investment group seeking to purchase [CBB]" and that CBB had secured "the Cap Can deal."[18]  (2006 Email; *see supra* note 16.)  In comparison, the October 1 Letter informed Plaintiffs that CBB would "begin due diligence regarding a potential sale of the company" within the "next twelve months" but that "[a]ny potential sale of the company at this point is truly speculative." (Oct. 1 Ltr. 3.)  While Plaintiffs did not receive this information at the same time as Siskey, the same material facts were ultimately disclosed to them *prior* to Plaintiffs' unit sales to Siskey.  Therefore, even if the time between the disclosure to Siskey and the disclosure to Plaintiffs was sufficient to constitute concealment, which it is not, Plaintiffs have not provided any evidence that the alleged concealment proximately caused their unit transfers.

93.     Furthermore, the uncontradicted evidence indicates that the Red Bull negotiations did not begin until *after* Plaintiffs sold their units.  (M. Smith Aff. ¶¶ 120–21 (stating that no discussions or negotiations with Red Bull began before October 2008, and that the first meeting with Red Bull did not occur until around December 2008); *see also Merrell*, ECF No. 139.21, R. Ex. Mike-20 (providing the 15 December 2008 Red Bull Presentation for members).)  Therefore, these claims also

---

[18] While Plaintiffs do not allege this as a basis for their fraud in the inducement claims, the Cap Can deal was also disclosed to members in both the March 2007 Letter and October 1 Letter to all members, providing in relevant part, that an additional bottling line would be installed in November 2007, which would create a separate revenue stream for the company, and that it would be one of only three facilities in the country with this type of modernized production site for resealable aluminum cans.  (Mar. 2007 Ltr. 2; Oct. 1 Ltr. 2.)

fail. There is simply no evidence of false representations or concealment by the Smiths because such evidence could not have existed at the time Plaintiffs sold their units. As a result, Plaintiffs' fraud in the inducement claims fail because Plaintiffs have not forecast evidence that the Smiths falsely represented or concealed material facts.

94. The Plaintiffs' fraud in the inducement claims also fail because there is no evidence that the Smiths had an intent to deceive Plaintiffs. To the contrary, the record indicates that Mike Smith took precautions to protect Plaintiffs from an informational disadvantage in the event they bought or sold units. The record is clear that in or around October 2007, Mike Smith informed CBB's corporate counsel at Wishart Norris of Siskey's potential knowledge of a sale of the Company and of his intent to purchase units. The resulting October 1 and 3 Letters corrected the possible asymmetry in information between Siskey and the Plaintiffs by disclosing that CBB was preparing itself for a possible sale of the company during the next twelve months. After providing this information, Mike Smith and other CBB members waited until October 15, two weeks after the October 1 Letter was sent to members, to sign any Consent Agreements approving some Plaintiffs' unit sales to Siskey. Against this factual backdrop, Plaintiffs have come forward with no record evidence to support a finding that the Smiths intended to deceive Plaintiffs.

95. Finally, Plaintiffs have failed to present evidence indicating they could not have discovered the truth of the matter through reasonable diligence. Rather, the evidence before the Court discloses that, even after receiving the October 1 Letter,

Plaintiffs made no investigation or substantive inquiries of the Smiths or CBB regarding any offers to purchase CBB, negotiations with a potential buyer, or other dealings relevant to each Plaintiffs' decision to sell. Given their failure to investigate, Plaintiffs' claims also fail because the record does not contain evidence indicating that reliance on the alleged concealment was reasonable.

96. Accordingly, Plaintiffs' fraud in the inducement claims against Mike Smith and Jennifer Smith are hereby DISMISSED.

### D. Constructive Fraud

97. "In order to survive a motion for summary judgment on [a] claim for constructive fraud, plaintiffs [a]re required to forecast evidence showing: (1) a relationship of trust and confidence; (2) that the defendant took advantage of that position of trust in order to benefit himself[;] and (3) that the plaintiff was as a result injured." *Strickland v. Lawrence*, 176 N.C. App. 656, 663 (2006); *see also Morgan v. Turn-Pro Maint. Serv., LLC*, 2020 NCBC LEXIS 5, at *24 (N.C. Super. Ct. Jan. 15, 2020).

98. First, Plaintiffs allege that Jennifer Smith, as an employee of CBB who communicated company information to members, owed a fiduciary duty to the Plaintiffs. (Second Am. Compl. ¶ 467, *Strack*, ECF No. 33.) Given that the Court has already concluded Jennifer Smith owed no such duty to the Plaintiffs, the Court also concludes that based on the evidence of record, no relationship of trust and confidence existed between Plaintiffs and Jennifer Smith. *See White v. Consol. Planning, Inc.*, 166 N.C. App. 283, 294 (2004) ("The primary difference between pleading a claim for

constructive fraud and one for breach of fiduciary duty is the constructive fraud requirement that the defendant benefit himself."). As a result, Plaintiffs' claims for constructive fraud against Jennifer Smith are hereby DISMISSED.

99. Next, Plaintiffs contend that, as the majority member of CBB, Mike Smith was in a relationship of trust and confidence with them. (Second Am. Compl. ¶ 464, *Strack*, ECF No. 33.) However, even if Plaintiffs establish the first element of the constructive fraud claims, those claims against Mike Smith fail because Plaintiffs do not show "through undisputed evidence [that Mike Smith] benefited himself through his [alleged] misconduct." *Morgan*, 2020 NCBC LEXIS 5, at *25.

100. Plaintiffs allege that the Smiths received financial incentives, lavish vacations, and other gifts from Siskey as a result of their misconduct. (Second Am. Compl. ¶¶ 84, 485, *Strack*, ECF No. 33.) However, the Smiths argue that they did not benefit from the Plaintiffs' unit sales to Siskey, and in fact there is no evidence that the Smiths even sought to benefit from those transactions. (Br. Supp. Mots. 19.)

101. The uncontradicted evidence shows that the relationship between Siskey and Mike Smith, and the favors or other indirect benefits allegedly flowing from Siskey to Mike Smith, are unrelated to the alleged misconduct. Plaintiffs argue that meals, events, and a $250 monetary donation to the Smiths' son's school, were received by the Smiths in exchange for enabling Siskey to purchase Plaintiffs' CBB units. (*See* Dep. Jennifer Smith 83:21–84:13, 87:13–88:9, 91:16–92:8, 102:19–25, *Merrell*, ECF No. 159.1 ["J. Smith Dep."].) However, this evidence is insufficient to establish that the Smiths received financial incentives, lavish vacations, and gifts

from Siskey *as a result of* the alleged misconduct. Instead, Plaintiffs' unit sales are distinct from any incidental benefit the Smiths may have received because of their friendship with Siskey. Plaintiffs have failed to offer any evidence in the record sufficient to create a genuine issue of material fact as to whether Mike Smith obtained a benefit from his alleged misconduct.

102. Therefore, the Court concludes that Plaintiffs' constructive fraud claims against Mike Smith fail because Plaintiffs have not forecast evidence that Mike Smith obtained any benefit from his alleged breach of fiduciary duty. Accordingly, Plaintiffs' constructive fraud claims against Mike Smith are hereby DISMISSED.

### E. Negligent Misrepresentation

103. "It has long been held in North Carolina that 'the tort of negligent misrepresentation occurs when (1) a party justifiably relies (2) to his detriment (3) on information prepared without reasonable care (4) by one who owed the relying party a duty of care.' " *Simms v. Prudential Life Ins. Co. of Am.*, 140 N.C. App. 529, 532 (2000) (quoting *Raritan River Steel Co. v. Cherry, Bekaert & Holland*, 322 N.C. 200, 206 (1988)). To succeed on such a claim, "[a] plaintiff must show that the defendant owed a duty to provide 'complete and accurate information' and that such duty was breached before a negligent misrepresentation claim will lie." *Martinez v. Reynders*, 2013 NCBC LEXIS 31, at **15–16 (N.C. Super. Ct. July 10, 2013) (quoting *Simms*, 140 N.C. App. at 533).

104. Plaintiffs allege that, prior to the sale of their CBB units, the Smiths were negligent when providing information to them, and as a result made negligent

misrepresentations to them. (Second Am. Compl. ¶ 494, *Strack*, ECF No. 33.) The information Plaintiffs allege was misrepresented is the same as argued by Plaintiffs in support of their fraud in the inducement claim. Further, Plaintiffs contend that they "actually and justifiably relied on the information provided by Mike Smith, Jennifer Smith and [CBB] to their detriment in deciding whether to sell their [units.]" (Second Am. Compl. ¶ 505, *Strack*, ECF No. 33.)

105. As a preliminary matter, there is no evidence to support a contention that Jennifer Smith, as an administrative employee of CBB, owed members individually a duty of care. Thus, Plaintiffs' negligent misrepresentation claims against Jennifer Smith fail as a matter of law.

106. Further, Plaintiffs have come forward with no evidence to create a jury issue as to justifiable reliance. "A party cannot establish justified reliance on an alleged misrepresentation if the party fails to make reasonable inquiry regarding the alleged statement." *Dallaire v. Bank of Am., N.A.*, 367 N.C. 363, 369 (2014) (citing *Pinney v. State Farm Mut. Ins. Co.*, 146 N.C. App. 248, 256 (2001) ("It has also been held that when a party relying on a misleading representation could have discovered the truth upon inquiry, the complaint must [show] that he was denied the opportunity to investigate or that he could not have learned the true facts by exercise of reasonable diligence.")).

107. Plaintiffs have produced no evidence suggesting they made reasonable inquiry into the alleged misrepresentations by the Smiths. *See State Props., LLC v. Ray*, 155 N.C. App. 65, 73 (2002) ("Reliance is not reasonable if a plaintiff fails to

make any independent investigation"). As stated herein, CBB information was available to members upon request, pursuant to the Operating Agreement. The record additionally discloses that no Plaintiff made inquiry of the Smiths or CBB regarding any of the matters claimed to have been misrepresented to them.

108. As discussed above, several Plaintiffs testified that they did not rely on statements made by the Smiths when selling their units and may have even disregarded any statements by the Smiths when deciding to sell their units. For example, plaintiff Robert Nastase's statement was that, when selling his CBB units, he "just relied on what [Siskey] told [him]." (Dep. Robert Nastase 41:24–42:16.) Plaintiffs have failed to come forward with evidence that they made reasonable independent investigation or were denied the opportunity to investigate these matters.

109. Therefore, the facts in this case permit only the conclusion that Plaintiffs did not justifiably rely on any alleged negligent misrepresentations by the Smiths. Accordingly, Plaintiffs' negligent misrepresentation claims against the Smiths are DISMISSED.

F.    **North Carolina Securities Fraud**

110. Plaintiffs assert a claim for securities fraud against the Smiths pursuant to N.C.G.S. §§ 78A-56(b1) and (c)(2) for allegedly aiding Siskey's purchase of the Plaintiffs' CBB units. Specifically, Plaintiffs allege that Mike Smith, acting as alter ego of CBB, violated N.C.G.S. §§ 78A-12(1), (5), and § 78A-56(b1) by (1) aiding Siskey's purchase of CBB units, (2) "reporting to the Plaintiffs' IRA custodian the

value of their [units] in an amount that allowed Rick Siskey to make misrepresentations to [members]," and (3) permitting Siskey to "use company letterhead to communicate with [members]" with the knowledge that Siskey was purchasing Plaintiffs' CBB units. (Second Am. Compl. ¶ 431, *Strack*, ECF No. 33.) Further, Plaintiffs allege that Jennifer Smith, acting as an employee of CBB, violated N.C.G.S. §§ 78A-12(1), (5), and § 78A-56(c)(2) by assisting Mike Smith in the alleged misconduct and thus "contributing substantial assistance" to Siskey. (Second Am. Compl. ¶ 433, *Strack*, ECF No. 33.)

111. Defendants contend that, even if the evidence before the Court might somehow satisfy the proof requirements for such a claim, Plaintiffs' securities fraud claims are barred by the statute of limitations. (Br. Supp. Mots. 52–53.) The Court agrees.

112. The statute of limitations for securities fraud actions is governed by N.C.G.S. § 78A-56(f):

> (f) . . . No person may sue under this section for any other violation of this Chapter more than three years after the person discovers facts constituting the violation, but in any case *no later than five years after the sale or contract of sale*, except that if a person who may be liable under this section engages in any fraudulent or deceitful act that conceals the violation or induces the person to forgo or postpone commencing an action based upon the violation[ (the "Concealment Exception")], the suit may be commenced not later than three years after the person discovers or should have discovered that the act was fraudulent or deceitful.

113. As this Court explained in *Aldridge v. Metropolitan Life Insurance Company*, the North Carolina Securities Act (the "NCSA") creates

a private right of action for persons injured from the sale of securities or the rendering of investment advice. Generally, the suit must be initiated within five years following the sale or the rendering of the investment advice regardless of when the plaintiff discovered the violation. However, where the plaintiff alleges that the defendant acted fraudulently or deceitfully in concealing a violation of the NCSA or NCIAA, a discovery rule applies, and the five-year limitation does not necessarily bar the plaintiff's ability to bring the claim.

*Aldridge*, 2019 NCBC LEXIS 116, at *54–55.

114. The last sale by any of the Plaintiffs in these actions was by Dallas Pendry, Jr., who executed his APA on 25 March 2008 and whose Consent Agreement was signed on 27 March 2008. (*Strack*, ECF No. 191.224, R. Ex. 531.) Therefore, Plaintiffs had to bring their securities fraud claims no later than April 2013. The *Merrell*, *Strack*, and *Cochrane* lawsuits were each initiated in late 2019, and the *Short* lawsuit was initiated in 2021.[19] Therefore, even in the light most favorable to all Plaintiffs, the statute of limitations bars an action for securities fraud.

115. Additionally, Plaintiffs have come forward with no evidence to support application of the Concealment Exception provided in N.C.G.S. § 78A-56(f). That exception would toll the statute of limitations if the Smiths engaged "in any fraudulent or deceitful act that conceal[ed] the violation" or induced Plaintiffs "to forgo or postpone commencing an action based upon the violation." N.C.G.S. § 78A-56(f). Accordingly, the Court concludes that Plaintiffs' securities fraud claims are

---

[19] *Merrell* was filed on 8 November 2019, (*Merrell*, ECF No. 2), *Strack* on 14 November 2019, (*Strack*, ECF No. 3), and *Cochrane* on 12 December 2019, (*Cochrane*, ECF No. 3). The *Short* action was initiated on 20 September 2021, (*Short*, ECF No. 3), after voluntarily dismissing without prejudice a previous action initiated on 20 December 2019, (*Short v. Smith*, 2019 CVS 23856, ECF No. 3).

barred by the five year statute of limitations in N.C.G.S. § 78A-56(f). Therefore, Plaintiffs' securities fraud claims against the Smiths are DISMISSED.

## G.    Civil Conspiracy

116.    "The elements of a civil conspiracy are: (1) an agreement between two or more individuals; (2) to do an unlawful act or to do a lawful act in an unlawful way; (3) resulting in injury to plaintiff inflicted by one or more of the conspirators; and (4) pursuant to a common scheme." *Strickland v. Hedrick*, 194 N.C. App. 1, 19 (2008) (internal marks omitted). "Sufficient evidence of the agreement must exist to create more than a suspicion or conjecture in order to justify submission of the issue to a jury." *Boyd v. Drum*, 129 N.C. App. 586, 592 (1998) (citations omitted).

117.    It is well established that

> [t]here is no independent cause of action for civil conspiracy. Only where there is an underlying claim for unlawful conduct can a plaintiff state a claim for civil conspiracy by also alleging the agreement of two or more parties to carry out the conduct and injury resulting from that agreement.

*Toomer v. Garrett*, 155 N.C. App. 462, 483 (2002) (citations omitted).

118.    Plaintiffs allege that Mike Smith, Jennifer Smith, and Siskey agreed that "Siskey would offer and purchase the Plaintiffs' [units] of [CBB] in order to cash in on distributions to [members]" and that "Siskey would provide financial and other incentives to Mike and Jennifer Smith in exchange for their acquiescence and assistance[.]" (Second Am. Compl. ¶ 484, *Strack*, ECF No. 33.) Plaintiffs argue, therefore, that the Smiths and Siskey conspired to commit securities fraud. (Second Am. Compl. ¶ 262, *Merrell*, ECF No. 24.)

119. However, each of the Plaintiffs' underlying claims against the Smiths fail as a matter of law, and therefore summary judgment has been granted and the claims dismissed. Accordingly, there are no remaining underlying claims of unlawful conduct to support the civil conspiracy claim. *See Toomer*, 155 N.C. App. at 483.

120. The civil conspiracy claims also fail for the standalone reason that the Plaintiffs have not offered evidence that the Smiths entered into any agreement with Siskey to accept financial incentives in exchange for facilitating or improperly aiding Siskey's purchase of the Plaintiffs' CBB units. A civil conspiracy must be shown beyond mere suspicion or conjecture in order to justify submission to a jury. The Plaintiffs *only* argument in opposition to the Motions on this point is the conclusory statement that "[s]ubstantial evidence exists to show the Smiths engaged in a conspiracy 'deal' with Rick Siskey," including a citation to Jennifer Smith's Deposition.[20] (Opp'n Br. 18.)

121. Therefore, the Court concludes that the Smiths have met their burden on summary judgment to establish that a crucial element of Plaintiffs' claims for civil conspiracy fails as a matter of law, and Plaintiffs have failed to forecast evidence demonstrating specific facts, as opposed to allegations or contentions, showing that

---

[20] Plaintiffs cite Jennifer Smith's deposition testimony, addressing email communication between the Smiths and Siskey on 5 September 2008. (J. Smith Dep. 94:16–97:17; *see also* J. Smith Dep. Ex. 60.) The 5 September 2008 email, sent by Jennifer Smith to Mike Smith and Siskey, states "Mike says he's busting his a** on this deal for you[.]" (J. Smith Dep. Ex. 60.) The evidence before the Court demonstrates that the word "deal" was used to mean a "potential sale of the company," and therefore Plaintiffs' reliance on the email, which was sent *after* all Plaintiffs sold their shares to Siskey, is not enough to demonstrate an agreement to engage in an unlawful act as to the Plaintiffs. Rather, it amounts only to a suspicion, and there is no other evidence offered by Plaintiffs for the Court to conclude otherwise.

they can at least establish a *prima facie* case at trial. Accordingly, the Plaintiffs' civil conspiracy claims against the Smiths are hereby DISMISSED.

## V.      CONCLUSION

122.    **THEREFORE**, for the foregoing reasons, the Court **GRANTS** the Motions. All remaining claims raised by Plaintiffs against Defendants Mike Smith and Jennifer Smith are hereby **DISMISSED** with prejudice.

**SO ORDERED**, this the 11th day of January, 2023.

/s/ Michael L. Robinson
Michael L. Robinson
Special Superior Court Judge
   for Complex Business Cases